IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| -vs- | ) | Case No. 18 CR 35-1 |
| | ) | |
| JAMES VORLEY, | ) | Chicago, Illinois |
| | ) | June 21, 2021 |
| Defendants. | ) | 10:00 a.m. |

TRANSCRIPT OF PROCEEDINGS - Sentencing
BEFORE THE HONORABLE JOHN J. THARP, JR.

APPEARANCES:

For the Plaintiff: U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION - FRAUD SECTION
BY: MR. AVI PERRY
MR. BRIAN REESE YOUNG
1400 New York Avenue, N.W.
Washington, DC 20005

U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION - FRAUD SECTION
BY: MS. LESLIE SALBA GARTHWAITE
219 S. Dearborn Street
Suite 500
Chicago, IL 60604

For Defendant Vorley: DECHERT LLP
BY: MR. ROGER ANSON BURLINGAME
160 Queen Victoria Street
London EC4V 4QQ

DECHERT LLP
BY: MR. MATTHEW L. MAZUR
1095 Avenue of the Americas
Three Bryant Park
New York, NY 10036

Court Reporter: KELLY M. FITZGERALD, CSR, RMR, CRR
Official Court Reporter
United States District Court
219 South Dearborn Street, Room 1420
Chicago, Illinois 60604
Telephone: (312) 818-6626
kmftranscripts@gmail.com

APPEARANCES: (Continued)

For Defendant Vorley: DECHERT LLP
BY: MR. CHRISTOPHER S. BURRICHTER
35 West Wacker Drive
Suite 3400
Chicago, IL 60601

(Proceedings heard in open court:)

THE CLERK: 18 CR 35, U.S.A. v. Vorley.

THE COURT: All right. Good morning. This is Judge Tharp.

Can we have counsel put your appearances on the record, please.

MR. PERRY: Good morning, Your Honor. Nice to see you again. For the United States, you have Avi Perry, Brian Young, and Leslie Garthwaite.

MR. BURLINGAME: Good morning, Judge. For Mr. Vorley, Roger Burlingame, Matt Mazur, and Chris Burrichter.

THE COURT: Good morning.

MR. BURLINGAME: And Mr. Vorley is present as well.

THE COURT: Good morning, Mr. Vorley.

THE DEFENDANT: Good morning.

THE COURT: In terms of masks, I will leave it to the individual's discretion as to whether you wish to wear a mask. You're not required to wear a mask. You're certainly more than welcome to do so. I think we have few enough people in the courtroom. And with the current vaccination status uprising, I'll leave it to the individual's discretion. All right.

We are here for sentencing in this case as to one of the two defendants, Mr. James Vorley.

Are we ready to proceed with sentencing?

MR. PERRY: We are, Your Honor.

MR. BURLINGAME: Yes, Judge.

THE COURT: All right. The first thing I'm going to do is swear in Mr. Vorley.

Mr. Vorley, you may have occasion to -- you will have an occasion to address the Court if you choose to do so directly. There may be other occasions when you have the opportunity to speak as well. You're not required to say anything at all during the course of these proceedings, but you should understand that anything you do say will be under oath, and it can be a crime to make any false statements under oath, so you certainly don't want to do that. And you should also understand that anything that you say during the course of these proceedings will be used by the Court in assessing the appropriate sentence to impose in this case.

Will you please raise your right hand.

(Defendant sworn.)

THE COURT: All right. I want to make sure I have received everything that was submitted by the parties in connection with this sentencing hearing.

I have, of course, received and reviewed the presentence investigation report -- oh, and I'm sorry. Can we have our probation officer, Mr. Freeze?

PROBATION OFFICER: Judge, Zakary Freeze with the

probation office.

THE COURT: Okay. Thank you.

PROBATION OFFICER: Thank you, Judge.

THE COURT: I have, of course, received and reviewed the very thorough presentence investigation report prepared by Mr. Freeze. I also received a supplemental report, the purpose of which was to provide two additional attachments. There was a little confusion about whether those got made, but they did make their way to me, so I have those.

I have reviewed the probation officer's sentencing recommendations, the government's version of the offense, the defendant's version of the offense, the government's sentencing memoranda and associated exhibits, the defendant's sentencing memorandum and associated exhibits and the parties' respective responses to the other's submissions.

Is there anything else that's been submitted that I have not referenced?

MR. MAZUR: Your Honor, it was attached to the presentence report, but there was a letter from Ropes & Gray on behalf of both of the defendants that was responsive to Professor Venkataraman's declaration, sort of supplemental to the versions of the offense.

THE COURT: Yes, I believe -- you said Ropes & Gray. Ms. Chin's response?

MR. MAZUR: There was that, but there was a letter on

Mr. McGovern's letterhead that was submitted on behalf of both defendants in April, I believe, that related to Dr. Chen's affidavit and responding to Professor Venkataraman's calculation.

THE COURT: Let me take a look to make sure. Do you have a docket number, Mr. Mazur?

MR. MAZUR: It's attached to the original probation presentence report because it was submitted to probation in April, I believe. In the attachments, it's listed April 12, 2021 letter to Mr. Freeze re: United States v. James Vorley and Cedric Chanu.

THE COURT: Yeah, I think I know what you're talking about. Yes. Yes, I absolutely did see that.

Okay. Anything else?

MR. PERRY: No, Your Honor.

MR. BURLINGAME: Judge, I just might note, I saw that you could identify that Mr. McGovern had dialed in. And if you don't see a number of dial-ins from the UK, that's because to save the expense of the long distance calls, Mr. Vorley's family has called Dechert. One of the associates there has dialed in on the Dechert line.

THE COURT: Okay. And that's fine. I anticipated that there would be many family members who are listening in, most of the -- what I see is just "guest."

MR. BURLINGAME: Okay.

THE COURT: It doesn't identify specific individuals unless they've gone through the website to identify themselves, which those folks would not have done.

All right. Moving forward then, the first issue is -- or questions to address is whether there are any objections to the factual materials set forth in the PSR.

I understand, of course, that there are very substantial factual disputes in this case to this day. That's not what I'm talking about. I'm talking about the underlying factual information that's set forth, you know, about Mr. Vorley, his history of employment, things like that, not the issues that go to the contested issues at the trial and that bear on the sentencing disputes.

MR. BURLINGAME: Judge, the only point I would note is just that the conversion between dollars and pounds can wreak a bit of havoc with sort of the perception of what an amount of money equals.

So, for example, you know, a beer here in Chicago is maybe $10 right now. It's also 10 pounds in London, and it's not taking into account that that 10 pounds is actually worth almost $15 now.

So I just wanted to sort of bring out that there's a little bit of inflation that goes on in that James's life is lived in pounds, and he's paid in pounds. And everything is getting converted into dollars, and it's looking like there's

more sort of wealth there than I think there actually is in practice. It's the kind of thing that if you were not living in the UK you might not note. So I just wanted to bring it up.

THE COURT: Well, let me just check something here.

I mean, as an example, the financial information that's set forth with respect to Mr. Vorley in the presentence investigation report is set forth in dollars which I understand were converted from pound amounts.

MR. BURLINGAME: Right.

THE COURT: So from that standpoint, we're dealing with the equivalent value.

MR. BURLINGAME: Right.

THE COURT: So I'm not sure I understand your point.

MR. BURLINGAME: Sorry. The point -- I'll try to make it clearer.

The point is that things tend to cost the same face value in the UK that they do here. So if you're buying a car --

THE COURT: Oh, you're just --

MR. BURLINGAME: -- that's $40,000 in the United States, it's not going to be 26,000 pounds in the UK because they're doing the conversion and everything. Like the life lived in pounds is more expensive when you convert it into dollars.

THE COURT: Well, if I'm understanding you, you're arguing that the cost of living in London is substantially greater than Chicago.

MR. BURLINGAME: In -- or New York, in pounds. Sorry. It's not a gigantic point. It's just that the -- you know, 100 pounds, if you're living in the UK, gets you about as far as $100 here does. It doesn't get you $140 worth. So there's a sort of magnification that takes place.

THE COURT: Well, all right. On a very imprecise level, I'll accept that generalization. Having spent some time in London myself, I will take notice that many things, it's not comprehensive, are a bit more expensive than at least here in Chicago. But the -- we can't do -- I'm not going to do much more with that, or --

MR. BURLINGAME: I just wanted to note it.

THE COURT: Okay.

MR. BURLINGAME: Thanks, Judge.

THE COURT: Did the government have any factual corrections it was seeking?

MR. PERRY: No, Your Honor.

THE COURT: All right. Then we'll move on to the point that the Supreme Court has directed that district courts begin all sentencing proceedings, and that is by correctly calculating the applicable sentencing guideline range.

The guideline range calculation -- or there is a

guideline range calculation set forth in the presentence investigation report which calculates the range as -- with an offense level of 12 and a criminal history category of I, producing a guideline range of 10 to 16 months, I believe.

The parties each have some objections to the guideline calculation.

The defendant's objections, if I'm understanding, are to the enhancement based on substantial foreign activity in the course of the scheme and/or sophisticated -- the use of sophisticated means. That's included in the same enhancement. And then also the defense objects, as I understand it, to the enhancement for the number of victims in the offense.

The government objects to the loss amount which the probation office basically took the position that it couldn't resolve and would leave to the Court the resolution of the loss amount and therefore awarded no additional points to the offense level based on the loss. And the government objects, maintaining that the loss is -- depending on which alternative is used is either about 1.2 or $1.1 million.

I'm going to start with the discussion of the loss amount. I have read, of course, the parties' submissions on this topic, and I have read the reports that the parties rely on from their respective experts, Dr. Venkataraman and Dr. Chen. Here's where I come out with respect to the loss amount.

The first question that has to be determined in assessing the loss amount is the scope of relevant conduct that should be considered in the loss amount. And the law is clear, this loss calculation includes losses caused by others' actions if those actions were, one, within the scope of the jointly undertaken criminal activity; two, in furtherance of that criminal activity; and, three, reasonably foreseeable in connection with the criminal activity.

The government submits that the trades that fit the person of trading presented at trial are also fraudulent, or were also fraudulent and should be factored into the loss calculation as relevant conduct. That is with respect to the other trades by Mr. Vorley, by Mr. Chanu, and by Mr. Vorley and Mr. Chanu in coordination, either with themselves or with David Liew.

Mr. Vorley maintains that the government's selection criteria are arbitrary. I am unpersuaded by that argument. That other criteria could have been used or considered and rejected either before, during, or after the trial is utterly beside the point. The relevant question is -- the relevant question as to relevant conduct is whether the selection criteria used by the government provide a reasonable estimate of loss.

Mr. Vorley argues that just because other trades are consistent with the pattern demonstrated at trial doesn't

prove that they were actually spoofing orders. And it relies heavily on *United States v. Chube* -- I'm not sure if I'm pronouncing that correctly, C-h-u-b-e II -- 538 F.3d 693 from the Seventh Circuit, to support that argument. In the *Chube* case, the government prosecuted two physicians for unlawfully prescribing OxyContin. The jury acquitted the defendants on most of the unlawful distribution counts, but at sentencing, the district court accepted the government's identification of patient files that were relevant conduct despite the fact that the criteria the government identified as supporting such a finding were not applicable to many of the files. There was no identification on a prescription-by-prescription basis as to what made the prescriptions part of the scheme.

I think that is a distinguishable situation from here. Here there's a well-defined set of criteria employed, and only the transactions -- and the only transactions that are included as relevant conduct are those that satisfy that set of criteria.

Coupled with the evidence that supports the jury's verdicts that Mr. Vorley engaged in a scheme to defraud, the evidence that he engaged in spoofing trades frequently, and the evidence that trading in this manner consistently -- or excuse me -- the evidence that trading in this manner was not consistent with economically rational strategy intended to actually execute the spoofing orders.

I conclude that these additional episodes of trading are reasonably, by a preponderance of the evidence, spoofing trades. As I explained in the posttrial motion, there was ample evidence from which the jury could conclude the transactions that fit the pattern were part of a scheme to defraud rather than a product of coincidence, and I think that extends to -- beyond the episodes that were specifically highlighted at trial to the episodes that fit the criteria that are identified in Dr. Venkataraman's methodology.

The defense, not surprisingly, also relies on the mixed verdict by the jury for support concerning the availability of alternative reasons why the defendants may have traded as they did in a particular episode, but it's impossible to know what the jury's verdicts were based on. Indeed, in their posttrial motions, the defendant suggested that the verdicts weren't based on the evidence at all; but we can extrapolate from the guilty verdicts because the jury found the defendant guilty of the scheme and guilty on multiple counts. Yes, the jury acquitted the defendants of the conspiracy charge, but the jury convicted the defendants of devising and carrying out a scheme to defraud. And the scope of the scheme extended at least to the spoofing trades that the defendants conducted individually and together. The trades were done for the indirect financial benefit of the defendants and so were in furtherance of the scheme. That

holds true of the trading that the defendants did with Mr. Liew as well.

Moreover, as everyone understands, the standard of proof applicable to the jury's verdicts was much higher than the standard of proof applicable to the process of making a reasonable estimate of the market loss from the defendants' fraudulent trading scheme.

The defendants complain, again, not surprisingly, to -- that it is -- would be profoundly unfair to disregard the acquittals in fashioning an appropriate sentence for the defendants. It's no more unfair to disregard the acquittals than it would be to disregard the convictions, and it's the convictions that require a finding that Mr. Vorley engaged in a scheme to defraud.

The acquittals don't eviscerate that finding. An acquittal reflects only that the particular trade wasn't part of the scheme. And the acquittal on the conspiracy as charged in the superseding indictment is not necessarily inconsistent with the convictions for the scheme to defraud. The jury could have concluded that there was no broader participation or coordination than between the defendants and Mr. Liew rather than the broader conspiracy that the superseding indictment alleged.

So for all of those reasons, I do find it appropriate to treat the roughly 5,900 trading episodes identified by

Dr. Venkataraman as the universe of relevant conduct, relevant trades that should be considered in the loss calculation.

So I move on now to that loss calculation. The base offense level for fraud offenses depends in part on the loss amount. And that in turn depends on the monetary loss the defendant either intended or actually caused, whichever is greater. The lodestar of intended loss is the amount placed at risk by the scheme. And that's where the analysis should start because the purpose of the fraud statutes is to punish the scheme, not simply the unlawful taking of money or property.

Stated another way, when the guidelines speak of intended loss, the relevant inquiry is not how much would the defendants probably have gotten away with but whether -- but rather how many dollars did the culprits' scheme put at risk.

And it is critical to understand and note that in calculating the intended and actual loss, the Court need only make a reasonable estimate of the loss. The basic flaw that I find in the defendants' arguments with respect to the loss calculation is that they demand a degree of precision that is at odds with the requirement of making only a reasonable estimate.

I find, for the reasons stated in the Court's posttrial ruling and in the government's sentencing submission that Professor Venkataraman's estimates of the market losses

resulting from the defendants' spoofing activities do provide a reasonable estimate of the intended loss from the spoofing scheme. His estimates are consistent with and supported by the trial evidence and provide reasonable controls to distinguish the effect of spoofing orders from normal trading activity. It's also based -- his estimates are also based on conservative assumptions and exclude factors that would likely increase the market loss estimates. Professor Venkataraman provided two alternative calculations using different control mechanisms for normal trading activity, and those different alternatives also provided consistent results: one approximately 1.2 million, the other approximately 1.1 million. And the similarity of those results provides further support for the reasonableness of Dr. Venkataraman's estimates.

The defendants counter with several arguments but none have persuaded me. Relying on -- through Dr. Chen's submissions, Dr. Chen makes the point that the criteria for sentencing are broader than the trial criteria because they include episodes where there was no execution on the iceberg order. That point is essentially irrelevant, however, as the attempt could move the market even if it didn't move it enough to meet the defendant's goal. As the government appropriately noted in its submission, a spoof order can affect market prices even if it does not move them far enough to benefit the

spoofer.

Dr. Chen also criticizes Dr. Venkataraman's methodology because it assumes that "the alleged victims would have executed trades for the same quantities at the but-for trade prices if the alleged spoof orders had not been placed." I find this to be off-base for two reasons.

First, we can't know with precision what traders would have done in the absence of a spoofing order. We have to make some assumption as to what that conduct would be. If this were a valid criticism, it would literally be impossible to calculate loss. Again, only an estimate is required. If there's a reasonable basis to say but for the spoofing, this is what would have happened, that is all that is required. And here there is. Looking at the behavior of market participants in the closest temporal proximity seems a very reasonable proxy for what would have happened in the next -- depending on the duration of any spoofing order, in the next half a second to, you know, several seconds.

Dr. Chen also complained that Dr. Venkataraman's methodology does not consider that the alleged victims or other market participants may also have benefitted from the price impact of spoofing orders.

Oh, I'm sorry. I need to go back. I neglected the second reason that I was not persuaded by Dr. Chen's critique that it inappropriately assumes that the alleged victims would

have executed trades for the same quantities. And that is by reference to Dr. Venkataraman's controls to exclude that but for activity from the effect of the spoofing conduct. And, again, it does so in two different ways and comes out with comparable results in each case.

Moving on, Dr. Chen complains that Dr. Venkataraman's methodology does not consider that the alleged victims or other market participants may also have benefitted from the price impact of spoofing orders. There are also at least two problems with that critique.

First, to the extent that Dr. Chen is referring to the effect of other market participants who were not counterparties to the defendants' trades, those gains are not relevant to the sentencing loss calculation.

More significantly, loss is calculated by the greater of intended or actual loss. And there's no basis here to say that the defendants intended to benefit anyone other than Deutsche Bank and themselves and their fellow traders by spoofing. If the loss a victim incurred trading with Mr. Vorley in a spoofing episode happened to be offset by some portion by gains that same party obtained by also trading on Vorley's side of the spoof in some other trade, that would be entirely accidental, and Dr. Chen provides no basis to suggest that such offsetting trades would be significant in any event.

The rule that intended loss applies when greater than

actual loss also undermines Dr. Chen's argument that Dr. Venkataraman's controls aren't a proper event study because he did not control for all factors that may have affected price. Even if there are other factors that could have contributed to the trading loss as calculated by Dr. Venkataraman, they have little bearing on the loss intended, which was to drive the price from the market price to the waiting iceberg order and is therefore appropriately measured without reference to other factors that may also have influenced the price movement.

The defendants intended to move the market by virtue of their spoof trades and in so doing intended to inflict the full amount of the resulting loss on the counterparty. That some portion of that loss might have occurred anyway isn't relevant because Mr. Vorley's intent was to move the market by his trading. That the market might have moved for some independent reason isn't relevant to the loss calculation because it's not something that Mr. Vorley factored into his intent.

The Seventh Circuit has explained that it is a faulty supposition that ill-gotten gains must have caused someone a loss to be considered in a loss calculation. Intended losses are intended losses, not bookkeeping entries.

What matters is not what actually happened but what the defendants intended to happen, and here, they intended to

move the market to their iceberg orders. That other factors may have contributed to whether that actually happened or not doesn't factor into the loss calculation.

Dr. Venkataraman also -- Dr. Chen says that Dr. Venkataraman also failed to control for quantity, but that's what -- part of what is being measured, is the impact of spoofing orders on market price and activity. By definition, one can't control for quantity here because the fact that there is more trading during spoof periods, as the government appropriately argues, is itself evidence of the market impact of spoofing.

Dr. Chen also argues that -- or made the point that a way to measure trading gains and losses is to compare price security traded at with underlying security value. That point is undeveloped and fails to claim, much less explain why this is a superior methodology in the context of a commodities fraud scheme in a market that plays a critical role in setting the value of the commodities being traded. And, again, the requirement is reasonableness, and this critique by Dr. Chen says nothing to suggest that Dr. Venkataraman's methodology is not reasonable.

Dr. Chen also criticizes Dr. Venkataraman's rate-of-spread-crossing alternative adjustment, claiming that it doesn't account for transactions that would have occurred at the BBO, the best bid or offer, and so it inflates loss

because it doesn't account for those trades that would have taken place anyway. But as the government explains, transactions during the spoof period at the BBO prevailing immediately before the spoof period would not cause any loss. And if the BBO moved during the spoof period, orders filled at that price would be appropriately included in the loss calculation.

So I do find Dr. Venkataraman's methodology sufficiently reliable to support an estimate of the losses caused or intended by the defendants. Of those estimates, the Court will adopt the more conservative of the two estimates: $1,135,974. That estimate at that level of specificity implies a degree of precision that I don't think is exactly warranted here. So for purposes of the Court's loss calculation, we're going to round up to the nearest 100,000 and estimate the loss to have been $1.1 million.

All right. That's the Court's ruling with respect to the question of the loss calculation. That was the only objections the government had to the guideline calculation, correct?

MR. PERRY: There was one other, which had to do with an enhancement for ten or more victims.

THE COURT: Oh, okay. The ten or more victim enhancement was the government's objection because it was not included in the guideline calculation, correct?

MR. PERRY: Yes, Your Honor.

THE COURT: Okay. All right. With respect to the ten or more victim approach, consistent with my conclusion that Dr. Venkataraman's methodology is correct, Dr. Venkataraman's report noted that there was trading by at least I believe the number was 322 distinct firms, and many times that amount of individuals trading through those 322 firms concluding that those episodes were part -- were properly considered as part of the relevant conduct here, the enhancement for number of victims is appropriately included and should be included in the guideline calculation. So I will include that enhancement.

The defendant's objection was the objection to the enhancement for substantial foreign activity and sophisticated means. I conclude that that activity should be -- or that enhancement should be included in the guideline calculation. There was clearly a substantial part of the fraudulent activity that took place in London where Mr. Vorley worked. That's where he entered the orders, communicated with other traders. Certainly some of the activity took place here where the orders were received. That's why this case is being prosecuted in Chicago. But the entry of the orders originated in London and therefore I believe qualifies for the substantial foreign activity enhancement.

Regardless, I think it's also appropriate to

characterize this fraudulent scheme as involving the use of sophisticated means. This was a market manipulation scheme that itself required a sophisticated understanding of the markets and how they work. It involved techniques in order entry designed to disguise spoofing orders and making them more effective, such as layering ten-lot orders. And it involved coordinated trading between Mr. Vorley and at least Mr. Chanu and Mr. Liew. So I do find that the sophisticated means enhancement is appropriate here.

Were there any other objections to the guideline calculation?

MR. MAZUR: Your Honor, we had also pointed out that under the guidelines themselves, these circumstances would warrant a downward departure separate from whatever variance the Court might grant.

THE COURT: We'll talk about that in the context of 3553.

MR. MAZUR: That's fine. Okay.

THE COURT: Okay. With respect to the guideline calculation, and this is only one factor among many that the Court has to take into account in assessing the appropriate sentence, but the Court is required to calculate the guideline range.

The PSR guideline range, again, reflected a total offense level of 12 and a criminal history category of I. I

conclude that there should be several additional enhancements to that calculation that result in a higher guideline range, and I will summarize the calculation here. For the record, it is based on the November 2018 guideline manual which is the manual that remains in force.

Counts 2, 8, and 10, the counts of conviction, are grouped under the guidelines, and the base offense level for the group is 7 pursuant to Section 2B1.1(a)(1) because the statutory maximum sentence for wire fraud is 20 years or greater, the maximum sentence being 30 years.

To that base offense level of 7 should be added an enhancement of 14 levels to reflect loss greater than $550,000 and up to $1.5 million.

The offense level should be raised an additional two levels as just indicated, based on the involvement of ten or more victims. That's pursuant to Section 2B1.1(b)(2)(A).

And the offense level should be increased by two additional levels pursuant to 2B1.1(b)(10) on the basis of involving substantial foreign activity and sophisticated means.

There are no victim related adjustments, no role in the offense adjustments, no obstruction of justice adjustments, so the adjusted offense level is 25.

There is no basis presented and the Court cannot conclude that Mr. Vorley has accepted responsibility for the

criminal conduct for which he has been convicted, so there's no reduction for acceptance of responsibility. So the final offense level is 25.

Mr. Vorley has no criminal history. He's in criminal history category I.

The combination of offense level 25 and criminal history category I produces an advisory guideline range of 57 to 71 months, a supervised release range of two to five years, a fine range of 3,000 to $1,000,000.

All right. Those are the guideline calculations that the Court finds in this case. Again, they are advisory guideline calculations. They are one factor among many factors that the Court has to take into account in assessing the appropriate sentence to impose. And we will turn now to consideration of those other factors that are relevant under Title 18, United States Code, Section 3553(a).

In this regard, I'll hear argument from the parties. I'll hear first from the government making its arguments on behalf of the sentence that it has requested.

Mr. Burlingame or Mr. Mazur, whoever is speaking, will have the opportunity to make arguments on behalf of Mr. Vorley.

And, Mr. Vorley, once your attorney has made his arguments on your behalf, you'll have the opportunity, if you wish, to address the Court directly. You're not required to

address the Court, but you will have that opportunity.

THE DEFENDANT: Thank you.

THE COURT: All right.

Mr. Perry.

MR. PERRY: Thank you, Your Honor.

The Court is very familiar with the facts of the case so I won't belabor my remarks today.

In plain terms, what Mr. Vorley did together with Mr. Chanu was fraud, and it was manipulation. The Court has now found appropriately that the conduct at issue spanned thousands of instances of deceptive and fraudulent conduct over a multiyear period and that all of these fraudulent trading episodes were aimed at one thing. They were aimed at disrupting a major U.S. financial exchange and deceiving other traders who participated in that market for the direct benefit, or perhaps indirect to use Your Honor's term, of the defendants and their employer, a major international bank, Deutsche Bank.

The conduct at issue here perpetuates the perception and unfortunately the reality that our financial markets are unfair, that there are actors who seek to abuse the markets for their own gain. And that erodes investor confidence. The Court heard quite a bit about this from Mr. Scheerer at trial, from Dr. Venkataraman, from Mr. Liew, and of course from Mr. Varner and Mr. Twells.

Mr. Vorley and Mr. Chanu flooded the market with billions of dollars of fake orders. And throughout this trial, throughout the pretrial proceedings and including up to -- and in the defendant's sentencing memoranda, there has been repeatedly the idea that Mr. Vorley did not know that his conduct was wrongful, that it was simply a competitive free-for-all market where anything goes and that people expected to be deceived when they traded on the CME.

The jury conclusively rejected that notion. The jury found that Mr. Vorley and Mr. Chanu acted with the intent to defraud, that they knew that what they were doing was wrongful, that they knew it at the time and they knew it before Dodd-Frank, they knew it because it is inherently wrongful, deceptive, and fraudulent conduct.

The Court has heard that from any number of people at this point. My argument is simply on the shoulders of what the Court understands from the defendant's own chats, from what the Court has heard from other market participants. This conduct, whatever you call it, whether you call it spoofing or by some other name, it is fraud. This notion that orders mean nothing, that they're just signals flashed into the void, devoid of any content, has been rejected by this jury. Orders mean something. When you place an order onto the exchange, you are telling other participants you are there to deal. An order doesn't mean nothing. It doesn't mean that I'm flashing

or I'm intending to trick you, and people don't perceive it that way. When you place an order to buy, people expect that you intend to buy. When you place an order to sell, people expect that you intend to sell. Mr. Vorley understood that, and he used that natural dynamic of the financial market to the detriment of other people in that market, of at least 322 unique other firms trading in the market at the same time, thousands and thousands of times.

The defendant -- excuse me -- Mr. Vorley knew that it was wrong, as I say, not simply because there was a CME Rulebook or not simply because Deutsche Bank's compliance policies prohibited the conduct, but because at its essence, the conduct is wrongful. It is deceptive conduct, and it's designed to be deceptive conduct to trick the algos or whoever else may be trading in the market at the same time.

So I think there's no doubt that this is a serious offense, and I will say that a -- I submit to the Court respectfully a serious offense requires and merits a serious sentence.

The United States does not lightly come in and recommend with no thought a guideline sentence here. There are factors of course that the Court has to consider. There are factors that the United States considers in advancing a sentencing recommendation.

I will tell you as a parent of young children myself,

it was difficult to read Mr. Vorley's letter to the Court. I fully credit how difficult the prospect of incarceration is on him, and I fully credit what the substantial effects would be on Mr. Vorley's family, not only his children but his partner and his parents and others who care for him. I don't come here to minimize that at all. On a human level, that resonates with me.

But the collateral consequences of Mr. Vorley's crime are of his own making. And candidly, Your Honor, those consequences do not distinguish him meaningfully from most defendants who come before the Court. Many defendants have elderly parents. Many defendants have young children or other dependents. I don't mean to suggest that the Court should not consider those personal circumstances. The Court should and must consider those circumstances. But they do not meaningfully distinguish Mr. Vorley from most people who stand before the Court for sentencing.

It's also worth noting, Your Honor, that -- and we touch on this in our sentencing submissions. Assigning undue weight at sentencing to the factors highlighted by Mr. Vorley in his sentencing memoranda, memorandum, factors such as loss of a treasured career, to use his words, factors such as reputational harm, even factors such as family impact, to assign undue weight to those factors here disproportionately benefits affluent offenders like Mr. Vorley who have those

things to lose. And the risks of disproportionately benefitting affluent offenders who stand to lose things is that disproportionately disadvantages nonaffluent offenders who do not have those things to lose. And that risk of a two-tiered system of justice, Your Honor, is important to keep in mind when the Court is wrestling with the appropriate sentence in this case.

All of which to say, I don't dispute for a moment that an incarcerative sentence, a sentence, as the government recommends, at the bottom of the guideline range or even, frankly, near there would be very difficult for Mr. Vorley and his family. I don't dispute it for a moment. But that is not a distinguishing factor that separates him from the vast majority of defendants who stand before the Court for sentencing, and it is not respectfully a proper basis for a departure that the Court should assign great weight to.

This was a closely-watched trial. It was a hard-fought trial, and it was a closely-watched trial. It was a bellwether. Market manipulation cases are not easily brought, and perhaps for that reason, they are not frequently brought.

The deterrent effect -- and I mean general deterrence here, not specific deterrence -- of a significant period of incarceration in this case will reverberate throughout the trading community. We conceded in our sentencing papers,

there is no, as far as the government is able to perceive at this point, need for specific deterrence at this point. But the Court only needs to read the newspapers to understand that there is a massive need for a deterrent effect more broadly. Unfortunately, manipulation is very common in our financial markets, whether it's the equities markets or the commodities markets. And the perception I believe, and I would submit to the Court, is that people can get away with crimes like this, and that even if, after many years of diligent investigation and prosecution and a jury conviction, even if they are ultimately convicted and held to account, the notion is, and this comes from many of the cases that the defendants have cited, that there will be a slap on the wrist. That simply does not deter people, would-be fraudsters, would-be manipulators, from engaging in this kind of destabilizing, disruptive conduct.

So the United States is respectfully asking the Court to impose a significant term of imprisonment in this case. I say that knowing full well that there are not many landmarks to guide the Court in terms of this specific kind of prosecution. We've discussed in our papers Mr. Coscia's case. The Court, of course, is familiar with Mr. Zhao's case, having sentenced Mr. Zhao. There was Mr. Sarao's case. Two of those involved cooperators with very different circumstances here. Mr. Coscia's case -- again, the government's position is

Mr. Coscia's case is most analogous. Mr. Coscia, like Mr. Vorley, was convicted of a manipulation offense -- it was commodities fraud and spoofing in that instance -- tried in this very courthouse and the loss amount in that case was roughly what it is here. In that case, it was actually gain, but the amount was roughly the same, about a million dollars.

I don't mean to suggest there are no meaningful differences between the two cases. There were, of course, but I think it cuts both ways. Mr. Coscia's conduct was of a far shorter duration. It was several months and that was it. It is true, on the other side, that Mr. Coscia's benefit inured directly to him, or substantially all the benefit inured directly to him, but those different factors cut both ways. And here, Your Honor, given especially the length of the conduct at issue, many years, the number of spoofing episodes here, the coordination of it, and frankly the callousness with which Mr. Vorley and his co-schemers spoke about their conduct, including his denials, his false denials when actually confronted by his own bank's compliance department in 2015, I submit respectfully, Your Honor, that those are aggravating factors that distinguish Mr. Vorley's case from Mr. Coscia's.

I'll note perhaps in an effort to anticipate Mr. Mazur and Mr. Burlingame's argument about departures under the guideline, there is no question that there is a departure

which is authorized in certain circumstances for manipulation crimes such as these, where there is a large amount of loss that is diffuse to many different victims, that each individual victim only suffers small losses. Not disputed. What I would submit though, Your Honor, is applying that departure in manipulation cases, even if perhaps that departure is aimed at manipulation cases effectively means that there will be no significant term of incarceration in manipulation cases because that is simply the dynamic of how those cases work.

That departure relied upon by the defendants is also countermanded by another departure. And I'm relying here -- we cited this in our reply brief, Application Note 20(A)(iv), that there may be cases in which the offense level substantially understates the seriousness of the offense, including, and I'm no longer quoting, where the offense creates, quote, "a risk of a significant disruption of a national financial market."

So the guidelines could easily point the Court in two different directions in a case such as this. It is true that the losses are diffuse among many market participants. It is also true, on the other side of the equation, this offense did create a risk of a significant disruption to a national financial market. The CME is such a market. There are billions and billions of dollars that trade hands -- that

change hands, excuse me -- every single day, even just in gold futures on COMEX. There was evidence to that effect in trial from Mr. Scheerer, I believe $26 billion. Of course his conduct wasn't limited to just gold, and of course, and I believe there was evidence about this as well from Mr. Varner, albeit in brief, that the effects here in the gold and silver futures market were capable of having a cascading effect into other markets. We talked about exchange trade funds, ETFs. And so all of that respectfully should factor into the Court's analysis here.

And the government would submit that while significant, a term of incarceration at or close to the bottom of the guideline range would be entirely appropriate here given the duration, the seriousness of the offense and the other factors, the other factors outlined in our sentencing papers.

So I think the Court has probably heard enough from me on this and perhaps over the past couple of months. Of course if the Court has questions, I'm very happy to do my level best to address them. Otherwise, we'll rest on the papers.

THE COURT: All right. Thank you, Mr. Perry.

MR. PERRY: Thank you, Your Honor.

THE COURT: Mr. Burlingame.

MR. BURLINGAME: Thank you, Judge.

Is it okay if I come up here to the podium?

THE COURT: Sure.

MR. BURLINGAME: The 3553(a) factors we're now turning to all center on context. They take sentencing out of the big picture generalities of market manipulation in a serious period and trying to focus the Court in on the specifics of the offense, the person in front of the Court for sentencing, the specific types of punishment that are available and are best suited to mete out a sentence that is necessary to fulfill sentencing goals but no harsher than necessary. Where specifically does the human being in front of Your Honor and his conviction fit within the range of people convicted of similar conduct? And what is needed in this specific, highly contextualized situation to achieve just punishment? I would submit that the government has not been taking into account the context that the law requires. And I would like to spend a little time talking about that context and how James ended up here.

In 2000, a 19-year-old James Vorley, somewhat amazingly and improbably, got a job as a clerk on a trading floor in London. It was his first job out of high school. For the next eight years, he served in sort of a trading apprenticeship that ended in his getting a job as the special -- special -- sorry, precious metals spot trader for Deutsche Bank. And the spot trader is the low guy on the

trading desk totem pole, but it was an absolutely remarkable achievement for James at age 26 and all the more so given where he came from and that he did it without any connections or a college education.

Now, around the same time, as Your Honor well knows, that James started working at Deutsche Bank, the futures markets were switching from the old-fashioned trading pits to computer screens, and hedge funds were developing the high-frequency trading algorithms that we learned so much about at trial. And the purpose of those algorithms was so that these hedge funds could reliably profit trading in front of large institutional traders and the manually executed orders put in by people like James.

In 2010, Congress passed Dodd-Frank with its confusing spoofing provision. And in the ensuing debate about what that meant, the CEO of the CME said in 2011 that, quote, "Bids and offers on the platform do not create an appearance of false market depth, as all bids and offers represent true and actionable market depth and liquidity until such time as they are withdrawn."

Now, Deutsche Bank itself said nothing on the subject until September 2012 when the bank finally told its traders that there was a spoofing provision in Dodd-Frank, but at that point it said that the CFTC had yet to provide clear rules and definitions. And it wasn't until the next year, 2013, that

the bank finally added spoofing to its list of prohibited conduct.

Two years later, the government charges first spoofing cases, bringing charges against Sarao and Coscia, two proprietary traders who built effectively spoofing machines that could make liquidity disappear before other traders could hit it. And in late 2017, the government brought the first spoofing case against a manual trader; and a few months later, Mr. Vorley and those charged at the same time were the second.

The government has said all along that this is a simple case of market manipulation. Fake trades were placed. Market participants were defrauded. And the jury convicted James on three counts of fraud, and our challenge to those convictions will come on appeal. I'm not seeking in any way to relitigate that here. But context is what today's hearing is about, and the context is that the crime of conviction even now is still not black and white.

Your Honor has acknowledged that the Court made difficult decisions about whether placing -- placing and cancelling executable orders on an open market could constitute fraud and that it's possible that the Seventh Circuit could see it differently. That this conduct could be deemed the crime of fraud in 2010 and 2011 was far from clear to the high school educated man before you today who was raised in the precious metals market and received

absolutely no training on this type of trading until long after the conduct of conviction.

It certainly wasn't clear to me. When I first heard the term "spoofing," it was from a trader in 2013. At that point, I had been a lawyer for 14 years, nine as a federal prosecutor and three as the head of a white collar section. I asked the trader if those orders that were being placed and cancelled were real. I asked if they could be executed when they were on the market. And having at that time not yet heard about Dodd-Frank's spoofing provision, I told him I would look into it some more but that it sort of seemed fine to me. If it was a live order that could be hit, that sounded like trading.

Four years later in 2018 when we filed the motion to dismiss this case with the unsolicited backing of the Chamber of Commerce, the Bank Policy Institute and the other amicus, I and many, many others watching this case were hopeful and expected that we would win it. We didn't. But the point is after four years of thinking about spoofing, it was still unclear to me and many, many other lawyers whether placing and cancelling executable orders could make out the fraud charged here. And that context is critical.

James is not somebody who blew through a clear stop sign because he thought he was above the law or because he wanted money or because he was overcome with ambition or

because he didn't take his job seriously. He was convicted of conduct that ten years later Your Honor has acknowledged the Seventh Circuit may yet determine will not make out the crime charged. That conduct, placing orders that could be evaluated and executed thousands of times over by the algorithms before they were cancelled, was certainly not clearly forbidden in 2010 and 2011. Dodd-Frank's spoofing provision wasn't in effect. Deutsche Bank hadn't trained its traders. No one had ever been prosecuted for this. And that matters enormously. James can't be punished with 2021 hindsight. His fate should be decided based on the context in which the conduct of conviction took place.

And it matters enormously that James traded openly, that he didn't try to hide what he was doing, that he was surrounded by supervisors and compliance officers who could and did watch him trade this way on their own screens. James worked in one of the most highly regulated workplaces there is, and he knew, for example, that when he mistakenly traded with himself, a compliance officer would be speaking about it with him in minutes. But for some reason, when Deutsche Bank put in trade surveillance software and it flagged James and others' trading as being potentially indicative of spoofing, no one ever asked him about it. No one ever bothered to mention it to him. And I would like to just stop and focus on that for one second.

Deutsche Bank clearly knew of Dodd-Frank's spoofing provisions if it put in place the trade surveillance system, but it didn't bother to mention it to its own traders, didn't bother to mention Dodd-Frank and the spoofing provision to its own traders for years.

And then when the surveillance system started flagging what it thought might be spoof orders, they still failed to mention it for well over a year. James was well aware that his trading was being monitored. He knew his supervisors watched the trades. He knew compliance officers sat next to him. He had every right to believe that he was doing -- that if he was doing something inappropriate, that if he stepped over a line, someone would say something.

The government didn't have any 404(b) in this case. There's no evidence he ever made another misstep in his long career. In fact, his compliance officer who most directly dealt with him and his direct supervisors said he was diligent and careful about following the rules. He was one of the good guys. If Deutsche Bank had even minimally performed their duty to James, I submit we would never be here.

The difficult issues surrounding the conduct of conviction are also highlighted by the jury's verdict. The government didn't set out to convict James for three trading sequences in 2010 and 2011 that it alleged caused -- that it alleges caused $190 in losses. Its case was that James and

many others inside Deutsche Bank engaged in a brazen, five-year criminal conspiracy to manipulate the markets. That was the case that was tried, and the jury acquitted James of that crime. Of the eight substantive counts, James was convict -- acquitted of five and convicted of three, all prior to Dodd-Frank's effective date and years before Deutsche Bank decided it might get around to teaching its traders about the law.

The Court has ruled there was sufficient evidence to support the convictions, and, again, I'm not here to relitigate that. What I am arguing is that the jury rejected the case that the government tried and that that is the case that the government is seeking five years for. The jury recognized, I submit, that the train we're on is far from clear, and I would urge the Court to take the acquittals into account as well as the three convictions because that lack of clarity goes directly to James' moral culpability for the conduct of conviction and to the severity of the crime of conviction. And I submit that that context cries out for leniency.

Of course market manipulation is serious. No one is debating that. But the context is critical, and all market manipulation is not the same. James didn't put money in his pockets from the conduct. And even under the prosecution's theory of loss which the Court has now adopted, for the

five-year scheme they charged, the differences to James' P&L were beyond *de minimis* in the context of a desk making an average of $96,000,000 a year and were rendered even more irrelevant given James's role not as a profit center for that desk but in supporting the other traders and the bank's customers.

There's simply no evidence that James was motivated by greed. The record is the opposite. He lives and has always lived modestly. He saved the money he made just as he did from his first paycheck forward. James was trying to do his job. And even from the government's perspective, he's an employee who crossed the line, not someone who was seeking to rip off others to enrich himself.

The person James is is also critical context. He is an admirable man, and until this case, a remarkable success story. By dint of his own hard work, he raised himself up to a position that exceeded all reasonable expectations given his background. And he not only handled that success with extraordinary fidelity to the grounded, hardworking, principled place he came from, but his professional success was actually the product of those values. His supervisors and the compliance officer who most closely worked with him all said, as I mentioned, that he focused on doing the job right, on following the rules and putting customers and colleagues first.

And what's interesting is that his supervisor said that James' customer focus rather than a focus on profits was the key to his rise. He didn't prioritize his own book and profits. He focused on his support role as a team player to the rest of the desk and to ensuring his customers were well served. That was what made him valuable to Deutsche Bank.

James' character shines through in the letters from his friends, colleagues, and family. And if we were in England today, this courtroom and an overflow room would be filled with people who have known James their whole life and for whom he is and always has been the steady, stalwart, farsighted pillar they could lean on, especially when times are at their hardest.

The greatest testament to James' character was his response to this case. I was with him following the charges, and he was completely broken by this, bewildered, at wit's end, sobbing. The life he dreamed of providing for his children and spent his whole life building was gone, and he was smart enough to realize that just the accusation alone meant that it wasn't coming back. At that time, he had a two year old, and his partner Lizzie was about to give birth to their second son.

Three and a half years later, the same thing is going on inside James. He is still destroyed. But he has spent those three and a half years so valuably. As I wrote in the

submission, you could almost, almost argue that it was for the best, at least for his two little boys. No father or mother has better cared for their children. Broken James applied the same determination, focus, dedication, and energy to his children that he had brought to his career for 15 years. He wakes them, dresses them, cooks all their meals, cares for them all day, every day, guides them, comforts them, makes them laugh, consoles them when they cry, and serves as the constant, ever-present stability in their lives. It is James, not their mom, who they run to when they fall. He is their world. And letter after letter after letter after letter testify about the job he is doing. He is raising two happy, stable little boys who are confident, polite, curious, joyful, and loving. They are boys who depend on their father entirely, and without him, they would be lost.

So would his partner Lizzie. She is now the family's sole breadwinner, and with James' conviction, it will be very hard for him to ever take that burden away from her, off her. The family has lost hundreds of thousands of pounds of deferred compensation and faces this significant penalty in the CFTC case. That case is continuing, but I think the closest analogy is the Flotron penalty, where he was acquitted on a very serious -- very similar conspiracy charge and got a $100,000 fine and a one-year trading ban. The ban is irrelevant. As we talked about, no one is going to be hiring

James again. But the $100,000 would be a very significant penalty.

James's family is helped by the money he started saving for them at age 19, but they cannot afford for Lizzie to lose her job. The savings in the PSR, in the house and in retirement accounts, what's liquid goes towards supplementing Lizzie's earning. But knowing this, she also knows that if James is incarcerated, she has to stop working to try to help their boys through the trauma of losing their father. They would not be able to visit him. They would be -- he would be suddenly gone, and at ages 3 and 5, they will in no way be able to understand this.

James has already been punished harshly. His career is over. It's not coming back. And he has no skills besides trading and is now a convicted felon.

As a man whose mother left him when he was 5, all James wanted was to provide stability and opportunity to Lizzie and his boys. He worked furiously and succeeded like the hero in a Horatio Alger story in service of supporting them despite the fact that for nearly his entire career, they were no more than a vision of a hoped-for future. Now that dream is gone.

Also gone is the person who existed at the start of Deutsche Bank's investigation in 2014. James has lost seven years of the prime of his life to this case. His first

interview with the bank was in 2014 when he was 34. He's now 41. He put his marriage to Lizzie on hold in 2014 because they wanted to celebrate without this cloud on the horizon. Instead of sharing that day, he now lives with the knowledge that she's been forced to sacrifice her dream of caring for her children full time. James has been utterly unable to put this behind him for seven years, stuck in a seven-year investigation and prosecution at the center of his life consuming him. Unable to know when and for how long he may be forcibly separated from his children, he and Lizzie have spent much of their time, of that time suspended in a state of anticipatory grief. It's taken its toll.

Perhaps the most depressing part of the letters from James' friends and family is the incredible uniformity in describing James' transition from a vibrant, confident, funny, happy person full of life to the somber, quiet, ruminative person who makes an effort for Lizzie and his boys but who is dead on the inside with nothing left for anyone else, consumed by worries about his family's future.

To the extent punishment is justified by the need to mete out payback on the wrongdoer, James Vorley has done his time. The case has left him a husk of who he was, taking from him everything but the ability to provide his family with daily love and immediate care at his own hand.

Incarceration here is simply not necessary and would

be unduly harsh in this context. It's unnecessary because of the punishment already inflicted and the context of the conviction.

It's also unnecessary for deterrence. The government agrees specific deterrence isn't at issue. General deterrence, I would submit, is not either. Here, again, context is all important. When James placed and cancelled orders in 2010 and 2011, Dodd-Frank spoofing provisions weren't in effect. Deutsche Bank hadn't trained anyone. And traders all over the world in many, many markets were engaged in what Professor Venkataraman called the cat-and-mouse game between institutional manual traders like James and the algorithms that profit by trading ahead of them.

The government decided to prosecute pre Dodd-Frank conduct by taking advantage of the ten-year statute of limitations for wire fraud affecting a financial institution, but by doing so, it ended up with convictions for decade-old conduct. Ten years ago, if I'm right, Your Honor had yet to take the bench, I was an AUSA in Brooklyn, and I believe Mr. Perry was still in law school. Ten years is a long time.

And the world and the financial markets is now a starkly different place than what it was. Banks train their employees on spoofing. They monitor them, and they even take the basic fundamental step of notifying them and addressing it when that monitoring raises a question.

People have been charged with spoofing. Many, many others have faced regulatory inquiries and lost their jobs. Spoofing has been on the front page of the business section time and again. The word is most definitely out. Spoofing is illegal. Do it, and your career is over, and you may be prosecuted.

The general deterrence message from what happened to James is already clear. Your career will be over. You'll never trade again. Your reputation will be destroyed, and you'll lose all your deferred compensation. The life you worked to obtain will be taken away from you.

And I just wanted to note here for the record that while James -- while general deterrence is, of course, an appropriate and absolutely necessary factor for Your Honor to consider, some of the factors that the government urged in its papers to consider are not. Arguing that James needs to go to jail because the government spends a lot of money on the trial or that the government is worried that others will see a lenient sentence and decide to fight a case rather than cooperate, or that future prosecutors won't pursue spoofing cases because they'll fear they won't get a long enough sentence at the end to make it worth their time, those are all impermissible factors for the Court to consider because they directly infringe on James' constitutional right to challenge the charges against him at trial. And he is not seeking

acceptance of responsibility, and so arguing he should be punished so that others will decide to cooperate or save the government the time and expense of going to trial is wrong. And it would be in any context, but it's especially wrong in a case where he was acquitted of six of nine counts, including the conspiracy count that was at the heart of the trial.

An incarceratory sentence is not only not required to serve the goals of sentencing, but it is unduly punitive given the context in which that sentence would be served. James would be many thousands of miles away from his family, unable to receive visits. And at the moment, UK citizens can't even come to the United States because of the pandemic. That fact alone, the distance, exponentially increases the severity of any incarceration.

But James would also be ineligible to serve his sentence in the prison camp he would serve it in if he were a U.S. citizen. The low security facility where he would serve any sentence is far more punitive and restrictive, again, ratcheting up the severity of the punishment for factors that have nothing to do with James or his conduct. And through his presence in that facility, James would be unnecessarily placing further stress on a BOP that is currently under orders from the attorney general to identify appropriate prisoners for home confinement due to COVID, a factor that many courts have considered in downwardly departing during the pandemic.

In cases without these added factors, the judges who most squarely face the decision before Your Honor have determined that jail time is not necessary. In the *LIBOR* and *Gramins* cases that we cited, the courts faced the question of how to properly sentence defendants following similarly and decidedly mixed verdicts in cases where traders at large financial institutions engaged in fraudulent schemes for conduct that they argued and the courts recognized was commonplace at the time.

*LIBOR* involved the submission of false information concerning the rates at which banks could borrow money. *Gramins* was a trader of residential mortgage batch securities who lied to his customers about the price at which he acquired the securities. In those cases, despite the defendants telling obvious, clear lies, not lies that the Court had to labor to write a decision to determine constituted lies based on the context of market dynamics, the judges found in *LIBOR*, the defendant shouldn't be sentenced as proxy wrongdoers for the sins of the industry; and in *Gramins*, that the degree to which the defendant's behavior departed from market norms at the time bore directly on the question of where on the spectrum of fraud cases he belonged.

In both cases, after carefully assessing the 3553(a) factors, the judges imposed non-incarceratory sentences, including periods of home confinement. Were the Court to

reach the same conclusion here -- oh, sorry. Were the Court should -- were the Court to reach the same conclusion here, I wanted to let you know that the -- I have another client, actually Mr. Sarao, who had done a substantial period of home confinement in the UK, and it can be effectuated. And I would urge the Court to reach that same conclusion here, that home confinement is all that's required.

THE COURT: Explain to me, Mr. Burlingame, how I could effectively supervise a defendant in the UK.

MR. BURLINGAME: Sure.

He was -- so this -- Mr. Sarao just got off of a year of supervised release at the beginning of 2021. And what the probation did, he was assigned a probation officer. There was a landline in his house, and he -- they would call randomly at all times of the day, and he had to be able to pick up that phone, take a picture of himself that was showing that he was in the house. And, you know, if there was a failure, then it would have been a violation of his terms of release.

THE COURT: And what would have happened then?

MR. BURLINGAME: He would have been brought back to the Court, resentenced. He still had his -- the properties --

THE COURT: How would he have been brought back to the Court? He would have been extradited on a supervised release violation?

MR. BURLINGAME: He would have -- I mean, I believe

he would have voluntarily appeared. He also had the properties that were supporting his house were still part of the -- sorry -- that were supporting the bond were still with the Court as -- actually, there was no cash in that case. So Mr. Vorley's bond would still be in place, and that, you know, it is his father's house, his own house, and an amount of cash, which is I think more than half of the liquid assets that he has available to him.

So I think that provides -- and more to the point, there's nothing in the record, which has been quite extensive to this date because things took so long because of the pandemic, to suggest that Mr. Vorley would ever violate the conditions of home confinement. He has been absolutely meticulous in observing the conditions of supervised release. And, you know, were he to receive that sentence, it would be -- you know, for very similar reasons to the ones Your Honor set forth in responding to the government's motion for remand following trial, it would be lunacy for him to violate the terms of home confinement because he would be subjecting himself to either he gets on a plane, comes back and faces an angry Your Honor who then provides a prison sentence, or he, you know, goes -- abandons his family and goes on the lam leaving their house and his father's house to be taken away, or tries to somehow get out of England without his passport with his family and lives on the lam for the rest

of his life. You know, I think no matter what sentence he would be facing for that violation of supervised release, you know, those are -- those potential outcomes just seem ridiculous. I think there's every reason to believe that he would assiduously not leave his house and be basically sitting next to the phone for whatever period of incarceration Your Honor decided on.

THE COURT: All right. Thank you.

MR. BURLINGAME: I would submit that the *Coscia*, or "COSH"-a, and *Zhao* cases, the defendants there are not similarly situated. In Coscia's case, he built a spoofing machine to pump and deflate markets that made the orders he placed and cancelled effectively illusory. They couldn't be hit. And he pocketed the money.

As to Zhao, he continued spoofing even after being told not to, being warned by the CME and his employer to stop. And his sentence of time served stretched to 11 months at his own hand because he fought extradition rather than jumping on a plane like Mr. Vorley to face the charges.

And also, I think it bears noting, I understand Your Honor's ruling as to relevant conduct, but it does bear noting that *Coscia* and Zhao were guilty of the primary charges against him, not acquitted of them following trial. And as Your Honor said when we last saw each other, those acquittals do need to be taken into account. This was a decidedly mixed

verdict. It was not a ringing endorsement of a five-year criminal conspiracy.

Looking ahead, it's possible to imagine the government seeking -- seeking time served for David Liew, the cooperator in this case. And so I think it also bears considering whether it will be appropriate for James to get the same sentence. So I just wanted to underline the stark differences between them. As the government frequently reminded the jury, David Liew's sentence must hold him accountable for all his crimes and not just the conduct of which James has been convicted.

Unlike the conduct at issue in this case, which Liew, the London School of Economics economics graduate, said he didn't realize even broke Deutsche Bank's rules at the time, he said that he did know that stealing from the bank and his customers with traders at other banks were crimes when he committed them and that he knowingly committed them anyway. That conduct, I would submit, is exponentially more deserving of punishment, and so the Court will have ample room to reward him from an appropriate sentence for those crimes based on his cooperation should it choose to.

Jail time would not only create disparate sentences with the *Gramins* and *LIBOR* defendants. But as the judges in those cases found, it is unnecessary here, given the context and the alternatives to incarceration that we just discussed.

James Vorley is a wonderful human being. I've known him for I believe six years now. And I would be honored and delighted if my daughters grew up to be as fine of a person as he is. He truly is. Matt, Lauren, Chris, Austin, Tiffany, and I have been honored to represent him and are heartbroken that our arguments to the jury did not fully succeed.

James is careful, stable, conservative, thoughtful, and farsighted. He started working in markets when he was 19 years old, going to work every day, working hard, and at 19 starting to save for the family he planned to have one day. He did not wake up eight years into this journey, devise a fraud, decide to risk everything he's achieved and all he hoped to build for absolutely no reason. He went to work, and he did his job. He has paid mightily and been punished harshly. More punishment from the CFTC is yet to come, and the punishments he has endured and will endure are lifelong no matter what happens today.

No legitimate purpose of sentencing is served by putting James in prison. It will not only punish him more severely than is necessary, but it will inflict untold harm on two little boys who rely on him for everything and who are off to a wonderful start thanks in large part to him.

James's life has been ruined for this conduct. He'll try to rebuild it as best he can, and when this is finally behind him, when this is finally behind him, but he will never

get beyond this.

Do we need to imprison him thousands of miles away from his family during a pandemic given the context around the crime of conviction, the person he is, the alternatives to incarceration that are available and the lack of need for any further deterrence? I beg Your Honor to let James return to his family and continue to take care of his little boys.

Thank you.

THE COURT: All right. Thank you, Mr. Burlingame.

Mr. Vorley, this is your opportunity to address the Court. Again, I have read your written letter to the Court. You have the opportunity to make any oral statements you wish to make. You're not required to.

THE DEFENDANT: I've written something, if that will be okay.

THE COURT: Certainly.

THE DEFENDANT: Thank you.

Your Honor, thank you for giving me the opportunity to speak today.

I would like to begin by thanking you, Your Honor, for all the hard work undertaken by the Court in September to keep everyone safe and allow the trial to take place. Moving forward was important to my family and I, and I know they share my gratitude that things were able to occur.

I would also like to thank my legal team. I will be

eternally grateful that at some of the lowest moments in my life, I had their skilled, honest and hard work to turn to, and I cannot thank them enough for standing by my side for years, even though my previous employer had withdrawn financial support for my defense.

Life has been hard, so hard for so long now, not just for me but for the people most dear to me. I know how hard it has been for my family to endure this process. They see what it has done to me and the strain that Lizzie has been put under. The suffering of those around me as a result of my involvement in this case has been obvious and painful. It is something I am deeply remorseful for.

I am not the man I was at the start of this process. I am very lucky to have a wonderful family and loyal set of friends who have stuck by me, kept a watchful eye and picked me up when I needed it. Through these very dark days, I have had one shining light, my children. I have taken solace in the fact that I have been able to spend so much time with them. They are the reason I get out of bed every day. I love them beyond measure. My conviction will have lasting impacts on their lives, and this fact destroys me. I have tried to be the best father possible to them, both, and I wish for nothing else than to be able to continue doing that and be there by their side.

Finally, I wish to thank Lizzie especially for her

support not just emotionally but also financially. She has sacrificed what should have been some of the happiest days of her life. At a time when she wanted nothing more than to stay home and be a mom to her children, she accepted responsibility for providing for our home. It has been hard watching Lizzie do this and knowing that every day she would give anything to swap places with me, to stay and look after our boys, but she can't because of me.

I'm here today, Your Honor, to ask for leniency. I cannot give Lizzie back the precious years she already lost, but I need to try to give her some in the future before our boys are grown up.

I know I will never work in financial services again. I know I will struggle to work full stop. But I must make this up to her and give her back her dream somehow.

Thank you.

THE COURT: All right. Thank you, Mr. Vorley.

Under Title 18 of the United States Code, Section 3553(a), the Court is required to impose a sentence that is sufficient but not greater than necessary to serve the purposes set forth in that statute. Those purposes include the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense. As well, the Court is required to impose a sentence that affords adequate deterrence

to criminal conduct, that protects the public from further crimes of the defendant and provides needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

These four considerations align with the four generally recognized objectives of criminal sentencing: retribution, deterrence, incapacitation, and rehabilitation.

In order to serve these objectives, the Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant. The Court is also required to consider factors such as the kinds of sentences available under the law, a category that includes consideration of the advisory sentencing guideline range, and the need to avoid unwarranted sentencing disparities among defendants who have similar records and have been found guilty of similar conduct.

Many of the facts and circumstances under these two broad headings overlap in that they may apply to more than one of the objectives. Often they point in different directions as to what they suggest the appropriate sentence in the case should be. It's the Court's task to balance all these considerations in fashioning a sentence that best promotes the sentencing objectives as a whole.

I'm going to consider -- or I'm going to discuss the factors that I consider most material to the question of the

appropriate sentence to impose in this case.

In considering the nature and circumstances of the crimes at issue here, we turn to the seriousness of the offense. The seriousness of fraud covers a wide spectrum. Some frauds are simple and relatively harmless. Other frauds are complex and substantial. So we have to look at the factors that relate to this particular fraud to assess the seriousness of the conduct here.

And there are a number of factors in mitigation here -- or excuse me -- in aggravation. This fraud did threaten the integrity of the markets on which the spoofing occurred, and the integrity of markets is a core component of our economy. This was conduct that threatened the integrity of the financial markets because as the government has argued, and I agree, it prompts people to question the lawfulness of the conduct and the good faith of the participants that operate on those financial markets. And it perpetuates the kind of thought process that says this system is rigged, rigged in favor of insiders and people who know how to manipulate it. That's the kind of criminal activity that undermines confidence of the public and the integrity of the markets, and it has ramifications beyond the markets themselves because so much of our economic welfare depends on financial markets and their fair and efficient functioning. When people don't have confidence in the reliability of those

markets, the economy suffers tremendously as we learned a decade ago, more than a decade ago now.

I understand the defense argument that the algos were deemed to be undermining the fairness of the markets and making it impossible for manual traders to compete, but that's not a problem or an issue for this Court to resolve. This Court has to confront the conduct that was placed before it by the government's charge in the trial of this matter, and what happened here is that manual traders were resorting to fraud to try to level the playing field. That's a crime, and it's a serious one. It's a crime that I think by a reasonable and yet still conservative methodology is calculated to have caused or intended a loss of more than a million dollars. That's a substantial loss, obviously, but it really pales in significance to the loss of the integrity of the markets and, again, the perpetuation of this idea that the markets are rigged.

I understand that the individual losses experienced by the counterparties in this fraudulent trading may have been, you know, on a trader-by-trader, firm-by-firm basis relatively small, and that can be a factor in mitigation. A fraud which causes a single victim a loss of a million dollars might appropriately be deemed a more serious fraud. But given the harm to the market generally here, I don't think that that rationale bears a lot of weight on the mitigation side of the

equation.

That this fraud took place over years is also an aggravating factor. It's a factor that relates, of course, to the amount of the loss, but it's also relevant here because it demonstrates this wasn't just an isolated, one-off bad decision. It was a sustained course of conduct, a sustained implementation of a criminal scheme.

It is also a matter of aggravation that this wasn't a crime driven by need. The flip side is that it was motivated, I'm confident, by a desire to try to level the playing field. And I think the arguments about Mr. Vorley's motivations are a bit too narrow in that regard. I acknowledge that there's no evidence that Mr. Vorley directly profited from these trades. The profits from this trading activity went to the bank. But it's the bank that sustained Mr. Vorley, employed Mr. Vorley, promoted Mr. Vorley, and that's I think motive enough to explain why he was willing to cross the line from conduct that was permitted by the rules to conduct that was not permitted by the rules and not permitted by the wire fraud statute.

This was still self-interested conducted. And I do agree with -- I don't how to pronounce his name. I apologize. Judge Chatigny.

MR. PERRY: "SHOT"-ne.

THE COURT: Chatigny, all right. That the degree to which behavior departed from market norms bears on the

question of where on the spectrum of fraud cases this case belongs. But this case, that doesn't mean this case isn't on the spectrum of fraud cases. It is.

And I also understand the defense argument that at some level the tolerance for bluffing in trading practices that disguise trading strategies might tend to produce -- the permissible strategies might tend to produce similar effects and have similar effects as the impermissible strategy and so arguably mitigate the seriousness of the criminal conduct designed to achieve the same result.

But that is not to say that I agree with the defense argument that the line between the permissible and impermissible was blurry and that Mr. Vorley merely stepped over it by accident because it was difficult to discern. The jury found and the evidence supported that Mr. Vorley had the specific intent to cheat counterparties out of money by lying about their intent to trade orders that they placed on the COMEX. That is fraud. That line isn't blurry or new. It's been there for a hundred years or more, and Mr. Vorley didn't step over it by accident. So the jury found and so I found that the jury's verdict was amply supported by the evidence.

Nor was this crime something that the bank is solely responsible for. I do agree that the bank did a poor job of training. It's judged by the fact that it apparently didn't attempt to train on Dodd-Frank until more than a year after it

was enacted. The bank has paid a steep price as well for that failure.

But you don't have to be trained to know that you can't defraud people. You can't lie to them to obtain their money or property. And the bank's failure to properly supervise significantly, in the Court's view, undermines the defense argument that no spoofing was going on because trading was supervised because the bank wasn't effectively supervising. The CFTC findings, which were provided in the defense submissions that the defense points to in support of this argument show a lack of adequate monitoring and supervision by the bank. And that undermines the argument that the defendants would never have engaged in this conduct out in the open if they believed it to be prohibited.

There is also a flavor in the defense briefs and in Mr. Vorley's letter to the Court blaming the high frequency algorithmic trading that was beginning to dominate the market and suggesting that spoofing was justified because otherwise manual traders could not hope to compete. But, again, this case isn't a referendum on the pros and cons of algorithmic trading or the rules under which it operates. If you don't like the way the market operates, don't operate in that market. What you don't get to do is make up your own rules about how to combat what you consider to be unfair advantages enjoyed by counterparties. At least you don't get to make up

the rules that are contrary to federal criminal law.

So for all of these reasons, I do find this to be a very serious offense notwithstanding some of the factors that the defense has argued mitigate and do mitigate, to some degree, the seriousness of the offense. It remains, however, a serious offense that had a substantial adverse impact on the integrity of commodities markets while it was ongoing.

Turning to Mr. Vorley's history and characteristics. In discussing history and characteristics of the defendants before me for sentencing, I routinely begin with the examination of their criminal record, and usually they have one. Here, of course, there is no criminal record. There's not even an arrest. By every measure, except his participation in this scheme, Mr. Vorley has led a perfectly law-abiding life. That is, I am willing to conclude based on the record that's been put before the Court, an understatement. Mr. Vorley is a self-made man, came from modest beginnings. As Mr. Burlingame I think appropriately characterized it, to start very improbably as a 19-year-old apprentice right out of high school working on trading floors and to work your way up to substantial positions of responsibility for trading for a major international bank is an incredible accomplishment. It is one that speaks volumes and more than I will give justice to in these brief remarks, more than even Mr. Burlingame's remarks have been able to

speak to the talent and resourcefulness and intelligence that Mr. Vorley has been blessed with, not only blessed with but used to, again, achieve some things that were I'm sure not within his or his parents' loftiest expectations when he was in high school.

So, too, I am tremendously taken and duly note the extreme devotion to his family, his friends. I'm sure they are listening very closely in London and elsewhere. I think Mr. Vorley's family situation is all the more remarkable because of what he has done during the pendency of this investigation. He has -- he didn't fold his tent. He didn't give up. Rather, he did what we all strive or should strive to do every day, which is make the most of what we've been given. Mr. Vorley is facing a tough road while doing everything he could to address that situation. He didn't ignore his other responsibilities and did everything in his power to make sure that he was providing for his children and his family. And I recognize that's not easy to do, and it is something that has -- this prosecution is something that has hung over the family's head for as long as it has been underway.

The collection of letters of support that have been provided for Mr. Vorley are remarkable. The outpouring of support from his family, friends and colleagues is a wonderful testament to his good character and deserves to be given very

substantial weight by the Court. Sentencing should not be solely predicated on the defendant's worst conduct; to the extent possible, it should reflect an assessment of the entirety of the individual defendant. And here that assessment should reflect that James Vorley is a fundamentally decent man who normally acts with integrity and loyalty and consideration for others.

I would also be remiss, however, if I failed to point out that Mr. Vorley's conduct during the March 2015 compliance interview with the bank did not reflect integrity or good character. And this is an episode into which we have a direct -- direct observation because we have a transcript, and, therefore, a very clear picture of what was going on. In that interview, Mr. Vorley clearly tried to mislead the bank's compliance officer about what was going on or what had gone on. And what he didn't say is what he has contended in this case: as far as he knew there was nothing wrong with his trading practices; that if he had crossed a line, he had done so accidentally. What he did was try to pass off the episode in question as the product of a data entry error, fat finger mistake. The problem is, as the bank's compliance officer pointed out, when you start trying to explain all the problematic trades by Mr. Vorley, you quickly run out of fingers when you evaluate that excuse against the volume of spoofing in which Mr. Vorley engaged.

Mr. Vorley now says that due to difficulties with his partner's pregnancy and the recent death of his uncle, he had not been prepared for this interview. Putting aside the fact that he arrived at the interview with a prepared script, you don't have to be prepared to tell the truth. But that's not what Mr. Vorley did, and the government's point about this episode in its reply brief has some resonance with the Court. Mr. Vorley's 3553 arguments would be more compelling if he had just come clean and admitted the obvious: that he tried to deceive the bank's compliance officer.

In considering how the facts and circumstances of the offense and history and characteristics of the defendant relate to the sentencing objectives under 3553(a), I want to first address a threshold issue. The parties disagree about whether collateral consequences suffered can or should be considered in assessing whether a sentence serves the objectives of sentencing. It is not disputed that Mr. Vorley has suffered already some significant collateral consequences from this prosecution and conviction. He has effectively lost the ability to work as a trader and quite possibly any ability to work in any capacity in the financial industry generally. He's lost substantial deferred compensation that he would otherwise have received from Deutsche Bank, and he's endured the embarrassment and strain of investigation and prosecution of this case over an unusually lengthy period of time. Nor is

it disputed that Mr. Vorley is likely to face some further collateral consequences, such as any penalties imposed by the CFTC.

The defense also submits that there are additional related factors that should be considered, such as the possible detention by immigration authorities to secure his removal from the United States after a term of imprisonment and the likelihood that he would be subject to a higher security designation by the Bureau of Prisons given his status as a nonresident and noncitizen.

The United States, in discussing these points, points to the Seventh Circuit's admonition in *United States v. Stefonek*, 179 F.3d 1030, where the Court stated that "middle class discounts" are not authorized in sentencing. The Court's point was that business criminals should not be treated more leniently than the disadvantaged simply because they will suffer consequences of losing things that the less advantaged have already lost or never had, such as careers, wealth, and prestige. I have no problem with that general point, but it also has to be understood that the admonition came in the context of a world where the sentencing guidelines were mandatory and the avenues for departures or variances were few and far between.

In the post-*Booker* world, where guidelines are advisory, courts are required to consider the guidelines as

only one factor among a myriad of others that the Court is required to take into account. And it can't be denied that collateral consequences bear on what is needed in a sentence to achieve many of those objectives, such as the need to provide just punishment, the need to deter criminal conduct, and the need to protect the public. As the Second Circuit noted in *United States v. Stewart*, 590 F.3d 93 from 2009, that is a post-*Booker* case. In that case, the district court imposed -- despite a substantial guideline range of 78 to 97 months sentenced the defendant to 20 months in prison in part because "the conviction made it doubtful whether the defendant could pursue his career as an academic or translator, and, therefore, that the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant." That's at page 141. The Second Circuit affirmed that reasoning, noting that the Court was required by Section 3553(a) -- or that the Court -- the district court's analysis was required by Section 3553(a) and added that, "It is difficult to see how a court can properly calibrate a just punishment if it does not consider the collateral effects of a particular sentence." I agree. I don't know how I can assess, for instance, the risk of recidivism by Mr. Vorley without taking into account all the factors and collateral circumstances that bear on that question.

I don't -- I agree, therefore, that it is appropriate to consider collateral consequences that bear on what sentence is sufficient but not greater than necessary to promote those sentencing objectives. I don't see how it is possible to determine what is sufficient or necessary in that regard without a full understanding of the factors relevant to those objectives, and some of those factors are found in the collateral consequences that a defendant has or will endure as a result of the conviction. This Court, and to my knowledge and experience the other courts in this district, regularly give consideration to such factors, and I do so here again.

Now, turning to those objectives, I address first the need to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense. As I have concluded previously in other cases, a serious offense requires a serious sentence, and a serious sentence is necessary to promote respect for the law. And where there has been a significant harm caused to the public or to individual victims, the sentence is required to take into account the need for punishment to vindicate those victims. The harm here that I am most concerned about again is the harm to the integrity of the market, and the conduct that threatens the integrity of the market, again, is quite serious and deserves some punishment.

The need for the sentence imposed to afford adequate

deterrence to criminal conduct is closely related to these factors.

As has been acknowledged, there are two types of deterrence: specific deterrence of the individual defendant and general deterrence of others who might be inclined to commit similar crimes. In considering the need for the sentence imposed to promote deterrence of both types, I note that the parties agree and I agree that Mr. Vorley presents almost no risk of recidivism, so there's no need for the sentence imposed to factor in weight to provide specific deterrence.

Incapacitation is the flip side of specific deterrence; to the extent the defendant poses a risk of recidivism, there's a concomitant justification for mitigating that risk by imposing a longer sentence that will provide greater protection to the public. But there is no risk of specific recidivism here by Mr. Vorley, and so I see no need for the sentence imposed to be concerned or based in part on the need to incapacitate Mr. Vorley from further committing crimes.

I turn then to general deterrence. In an increasingly secular society, law is one of the means by which we as a society identify and affirm the standards of conduct that we will tolerate and the conduct that we will not tolerate. And the enforcement of those laws is a vital part

of preserving the fabric of our society. The public has to have confidence that the standards that we identify have meaning, that they will be enforced and that they can be relied upon, and that is part of the role of general deterrence. General deterrence is essential to promoting confidence in the rule of law.

There is, moreover, an outside need for general deference in the context of crimes like this which threaten the integrity of the financial markets. General deterrence doesn't do a lot to dissuade people from committing crimes of passion or crimes of opportunity or crimes driven by dire circumstances like poverty and addiction. The role of general deterrence is greater where the conduct is calculated and where it reflects more of a cost benefit analysis, and that's the context in many white collar cases and I believe here as well. The role of general deterrence has to be credited in that context. The damage that could be done if it is perceived that fraudulent trading like spoofing is unlikely to result in a prison sentence is significant. That message has the potential to change the risk/reward calculus substantially. A sentence with no prison term would, in the Court's view, substantially undermine the message that if you attempt to manipulate the market, the price you will pay includes prison. It's not enough to just say we've done enough to prevent spoofing so there's no need to impose any

sanction on the basis of continuing to generally deter people from engaging in that conduct. That conduct can still occur and still needs to be deterred.

And it's relevant, as the government argues, to acknowledge that looking at general deterrence should be broader than just spoofing. Spoofing is but a species of market manipulation, and history has suggested time and again that there is an ongoing need to investigate, prosecute, and punish market manipulation schemes. The audience that learns of the sentence imposed in this case will be significantly broader than commodities traders on the futures markets. Everyone who works in the financial markets has to be reminded and understand that attempts to manipulate the market by any means will expose them to substantial criminal sanctions.

In considering the need to avoid unwarranted sentencing disparities, I note that the guidelines are the best tool available to try to reduce sentencing disparities. As explained by the Supreme Court, that is why district courts must treat the guidelines as the starting point and the initial benchmark in considering the sentence that satisfies Section 3553.

As has been discussed, it's also relevant to consider what has happened in other spoofing cases. And to be clear, I'm using the shorthand "spoofing cases." The Court is well aware that this was not a case that charged spoofing but

charged wire fraud. And where I'm talking about spoofing, what I'm talking about is placing orders that at the time they were placed, the trader had no intention of trying to execute. They were not placed in order to be executed. They were placed for the purpose of trying to manipulate the market. And the fraud involved was the failure, the implicit misrepresentation that the purpose of the trade was bona fide rather than to move the market. That's what I'm referring to when I'm talking about this trading, whether I refer to it as market manipulation by fraud or spoofing or wire fraud.

In the *Coscia* case, in my view, looking at that case, that case involved more extreme conduct than here and a stronger case on the facts. The losses were higher, not by a quantum amount, but they did lead to direct profits for the defendant. The guidelines the defendant faced were higher. The defendant went to trial and testified falsely. And despite the higher guidelines, despite the higher losses, despite the express design of a computer algorithm, the defendant received a sentence of 36 months. I intend no criticism of that sentence whatsoever. I'm merely marking the point that the defendant in *Coscia* received a sentence of 36 months, and in the Court's view, the circumstances of that case were more serious and more egregious than here. Yes, the *Coscia* scheme did not last as long, but that's not to say it wouldn't have lasted as long. And going back to an earlier

point, the fact that the losses exceeded the losses here despite the scheme lasting there only four months is not something that I think makes that scheme less dangerous or less harmful. It makes it more dangerous and more harmful to the smaller volumes and smaller losses caused by the defendant's conduct in this case.

In the Zhao and Sarao cases, both defendants received time-served sentences. Both were cooperators and pled guilty. Both had significantly more time in custody than did -- than the two days that Mr. Vorley has spent in custody during the bond proceedings in this case at the outset.

In considering the kinds of sentences available, I take into account the advisory guideline range, which is 57 to 71 months. I take into account this is a Class B felony -- these convictions are Class B felonies. Probation is not an optional sentence. There is no mandatory minimum sentence. The maximum sentence is 30 years on each count, for a total of 90 years.

We've had some discussion about home confinement, and the defense maintains that home confinement during a period of supervised release is a viable option, that it would not force Mr. Vorley's partner to quit her job to care for their children while he serves a sentence and argues that compliance is assured because he showed up for trial, as well as the additional arguments that Mr. Burlingame has made in response

to the Court's question here today. I remain skeptical about the efficacy of supervision on -- from the United States to the UK. Not that if a -- not that if a defendant was inclined to comply that that couldn't be established, but due to the difficulty in enforcing penalties and sanctions in the event of noncompliance.

I also register and acknowledge the defense argument that Mr. Vorley is ineligible for designation to a camp under BOP policy, so any time served would be under harsher conditions than would be likely experienced by other first-time white collar offenders.

All right. Mr. Burlingame, are there any other factors in mitigation that you have not already discussed that you wanted to raise? This will be your last opportunity. And are there any factors in mitigation that you believe the Court has not adequately addressed in its comments here today that you would like me to address further?

MR. BURLINGAME: Your Honor, I think the main thing I would like to say is that if the Court would consider home confinement if it could be convinced that it could be properly effectuated in the UK, then I would ask for the opportunity to be able to speak with the probation officer who supervised Mr. Sarao and get the Court the details of exactly how that took place and try and provide you with comfort as to -- that that could be effective.

THE COURT: Noted. We'll return to the subject, or I will address that subject.

Mr. Perry, anything else from the government?

MR. PERRY: No. Thank you, Your Honor.

THE COURT: I'm sorry. Mr. Burlingame?

MR. BURLINGAME: There was just one thing that Mr. Mazur reminded me of. Just, you know, I am sure that the Bureau of Prisons in response to Mr. Vorley's celiac disease -- which is quite a real thing; he has a severely adverse reaction to having any wheat -- would assure that, you know, they could handle all sorts of issues with all sorts of defendants. In my nearly 20 years of dealing with them, I would just note that I would guess that may not be perfectly executed and is another mitigating factor that we just didn't touch upon.

THE COURT: All right. Without denigrating, I am blessed not to have that problem, but I am certainly well-acquainted with friends who have that problem. It is nothing to be sneezed at. It is a condition that can cause great discomfort and health problems, acutely so. So I don't downplay the seriousness of that, but it is also not an uncommon condition. It is not a condition that cannot be accommodated in the Bureau of Prisons. So I don't believe it's a factor that weighs on the question of whether the sentence imposed in this case should include a term of

imprisonment or not.

MR. BURLINGAME: Right. I was more thinking -- I understand it's not the most weighting factor on the Court's mind. It's more that just in the context of the pandemic and the BOP's current directive to be finding inmates who can be -- where home confinement is an adequate sentence, you know, it is in that mix of I think in these special circumstances at this time and in all of the contexts I went through before, just another factor weighing in favor of a sentence that doesn't include jail time.

THE COURT: I understand.

On September 25, 2020, defendant James Vorley was convicted following a trial by jury of three counts of wire fraud affecting a financial institution in violation of 18, United States Code, Section 1343.

I have considered the arguments presented to me by the government, by defense. I have considered Mr. Vorley's written statement and his oral remarks here in court today. I have considered the -- I believe it's 27 letters of support that were provided to the Court on Mr. Vorley's behalf. I have considered the advisory federal sentencing guidelines and the policy statements that inform their application. I have taken into consideration all the factors set forth in Section 3553(a) and considered the totality of the circumstances in this case in fashioning a sentence for

Mr. Vorley, which I am now prepared to impose.

The minimum term of imprisonment that can be imposed is one day. As I had indicated, these convictions are not eligible for probation. The maximum sentence is 90 years. . That's quite a range. It's narrowed substantially under the guidelines to a range of 57 to 71 months. The government has recommended a sentence of 57 months, the low end of the guideline range that is applicable as found by the Court. The defense has requested a sentence of time served.

The central, fundamental question the Court has to address in sentencing Mr. Vorley is whether Mr. Vorley's sentence should include a period of custody. It is a decision that I have been grappling with off and on for several months. It's a decision I've been grappling with over the past week every day and almost every waking hour. There are, as reflected in the parties' arguments and as is to be expected by very competent, professional counsel on both sides of this prosecution, reasonable arguments to make in both directions. It has been a very difficult decision for the Court to reach, but it is a decision that I am convinced is the appropriate decision giving the appropriate weight to the factors set forth in Section 3553(a).

I conclude the sentence in this case must include a term of imprisonment. A sentence without a term of custody would not give sufficient weight to the objectives of

promoting respect for the law, providing just punishment for the criminal conduct on which the defendant has been convicted and providing adequate deterrence. Indeed, in the Court's view, a noncustodial sentence would risk undermining deterrence by perpetuating an expectation that white collar crime will not be met with significant sanctions and that affluent criminals are not called to account in the same manner as less advantaged defendants.

That said, the sentence suggested by the guidelines and advocated for by the government is, in my view, significantly greater than necessary to promote those objectives. Here the most significant impact will come from the fact of imprisonment rather than its length. As long as the sentence is not so low as to be perceived as inconsequential, I believe it will adequately promote respect for the law, provide just punishment, and provide adequate deterrence.

There are other factors that bear on the consideration of the appropriate length of the sentence. I include in that category the age of the charges, the length of the investigation and prosecution. This is an unusually long course, has been an unusually long course for many reasons. These are charges that are difficult to investigate. The prosecution has been fiercely contested every step of the way, and a global pandemic further delayed resolution. I intend no

criticism of the government or the defense. I'm simply noting the fact that this has been an unusually long prosecution and has exacted, therefore, in an unusually severe strain and uncertainty on the defendant and his family.

With respect to Mr. Vorley's family, the effect of this sentence on them I am painfully aware of. It is an unfortunate fact that virtually every defendant who appears before the Court for sentencing has family who love, support, and depend on that defendant. In virtually every criminal case, family members are unintended victims of the criminal conduct. That Mr. Vorley is fortunate to have a wonderful family, a supporting partner, healthy and well-adjusted children are assets that many people who are sentenced in this Court have jeopardized by their criminal conduct. And in that regard, while it is heartbreaking to anticipate the effects of the sentence imposed on this -- in this case on Mr. Vorley's family, the responsibility for that lies with Mr. Vorley.

I want to note the loss calculation, the other guideline enhancements that the Court has ordered and approved would not change the Court's view about the sentence that is appropriate to serve in this case. I'll note in that regard that even if no -- even if the guideline calculation set forth in the PSR had been adopted by the Court, the guideline range would still have been 10 to 16 months; and the sentence I am imposing in this case is a sentence of 12 months and one day

in custody.

Mr. Vorley, the one day, as you may have already been advised by your attorneys, is necessary to make you eligible for good time credits, which, if earned, may result in a reduction of your sentence by about 15 percent.

The Court has given consideration to imposing a fine given the assets that Mr. Vorley has and his net worth as reflected in the presentence investigation report. However, I have concluded that a fine is not necessary in the context of the prison sentence that's being imposed, given the prospect that Mr. Vorley's partner will have to leave her employment, that there will be a drain on assets available given the reduced employment opportunities that Mr. Vorley now faces, given the ill-liquid nature of -- relatively ill-liquid nature of most of Mr. Vorley's assets and given the yet to come penalties to be imposed by the CFTC. So no fine will be imposed.

Restitution is mandatory in this case. But as I understand it, the penalties that the bank has paid have extinguished the restitution obligation. So we had to go through this with Mr. Zhao, but I think the simplest way to deal with this is simply not to impose restitution. But if either party has a view that imposing restitution in reflecting that full payment of restitution has been made, we can do that, but that seems unnecessarily complicated.

MR. PERRY: I agree, Your Honor.

MR. BURLINGAME: No objection, Judge.

THE COURT: All right. So no restitution will be ordered for that reason.

I am required by law to impose a special assessment of $100 on each count of conviction. There are three counts of conviction, so the total special assessment is $300.

I will not follow the term of custody with any term of supervised release.

Returning to your point, Mr. Burlingame, my decision is not affected by -- ultimately by the efficacy of home confinement or the ability to effectively monitor that. For the reasons that I've stated, I conclude that a prison term is necessary. And I'm not imposing a term of supervised release after that, so there will be no need to monitor Mr. Vorley once he has served the sentence in this case.

That will be the sentence that the Court imposes as to Mr. Vorley.

Mr. Vorley, you have the right to appeal the judgment that is going to be entered in this case. Any appeal must be initiated by filing a notice of appeal in this district court within 14 days of the entry of the judgment order on the docket.

That order, Mr. Burlingame, will be likely entered by tomorrow, which will start the appeal clock.

Is the defense seeking any recommendations to the Bureau of Prisons?

MR. BURLINGAME: Judge, we haven't -- I don't think we've thought through exactly where would be most -- I assume it will be the facilities eligible on the East Coast so it's the least amount of time difference and taking his celiac disease into account.

THE COURT: All right. Well, I'll certainly make a note in the judgment and commitment order about the celiac disease. If you want to confer and get back to my courtroom deputy with a recommendation as to a place of incarceration, I'll be happy to make that.

Mr. Vorley, you should understand I can only make a recommendation. I can't dictate to the Bureau of Prisons where they designate you to serve this sentence.

MR. BURLINGAME: Thank you, Judge.

THE COURT: All right.

Mr. Freeze, anything from probation's perspective I neglected to cover?

PROBATION OFFICER: No, Judge. The only thing left is a report date or whether the defendant is going to be taken into custody. I mean, that's the only thing that needs to be discussed.

THE COURT: I suspect we'll address that momentarily.

All right. And to be clear, for purposes of the

record, the sentence imposed is 12 months and one day on each of the counts of conviction to be served concurrently.

All right. Mr. Perry, anything else from the government?

MR. PERRY: No, Your Honor. Thank you.

THE COURT: All right. What is the -- what are the parties' positions with respect to bond pending appeal?

MR. YOUNG: Your Honor, I'll make our points on this.

We're asking for a surrender date, and we would oppose a motion for bond pending appeal.

THE COURT: Mr. Burlingame, or Mr. Mazur?

MR. MAZUR: Your Honor, yeah, if I could speak to this.

I had conferred with the government prior to today about the surrender date, and we would agree with that. We do intend to move for bond pending appeal. We could discuss that with the Court now. We could brief it after. Obviously we didn't have the benefit of knowing what sentence the government would -- or the Court would impose, and so we would like some time to maybe consult with our client. But we could make the motion orally now or brief it for the Court.

THE COURT: All right. Well, I'll consider you to have made the motion for bond. What kind of time are you looking for for briefing?

MR. MAZUR: To brief? It would be just a couple of

weeks I think would be fine. But really, if I could -- I'm happy to -- I'm sure the Court knows the standard here.

THE COURT: I do.

MR. MAZUR: Okay. So I'm happy to also describe it. If the Court feels like it needs briefing, though, I would say two weeks is fine.

THE COURT: Well, let's do this. Give me your oral argument about what you think your brief would say.

MR. MAZUR: Okay.

Your Honor, I think our brief would say that the three factors the Court has to consider that we have to establish by clear and convincing evidence are that Mr. Vorley poses no flight risk, that he's not a danger to the community, and that there are substantial issues to be litigated on appeal. And "substantial issue" doesn't mean that the Court thinks it ruled incorrectly but really just that the Court finds that the issues which could affect the validity of the conviction or the sentence are debatable. And the Court has I think acknowledged on the record that some of the issues that it decided were difficult ones and may very well be decided differently on the appeal.

You know, without exhaustively naming the issues that we would raise on appeal, we would obviously raise the issue of whether an executable order on an exchange says anything more than willingness to transact; it says that, in fact, you

intend to transact. Obviously we would litigate the materiality question as well. Where orders are cancellable and aren't all the time cancelled and don't have to be left open for any period of time, could any market participant reasonably rely on that -- what the Court has found was the lie?

There is the speedy trial issue which is substantial, in which the Court acknowledged that the time was not excluded on the record but found that in its mind it had made the exclusion for effectively nine months.

There's the introduction of text messages that frankly didn't relate to the conduct that was being prosecuted. It was something else, as we noted many times before trial and the Court allowed to come into evidence, including one that says spoofing -- that spoofing is illegal, had a terrible effect on the defense.

And, finally, the failure to give the good faith instruction in a case where there was some deception permitted as opposed to cases where there wasn't any deception permitted.

And so I think -- we think that there's any number of issues that are debatable that would be litigated on appeal and could easily support bond pending appeal.

THE COURT: All right. Well, here's what -- obviously there have been many contested issues in the course

of this prosecution.

MR. MAZUR: I only listed four.

THE COURT: There have been many more.

MR. MAZUR: There have been many more.

THE COURT: The standard that's been adopted by the Seventh Circuit is not whether an issue is debatable but whether an issue is close, which I think is more than, you know, is it debatable could somebody potentially see things the other way. But that's what I would like you to focus on in your briefing. Clearly there have been some issues that, you know, I think a reasonable jurist could potentially have gone the other way on. I'm not sure that's the definition of close or that satisfies the statutory standard for a ruling likely to result in reversal, or I think the -- I think the -- the most applicable condition in the statute is the one that, you know, might make it -- might effectively moot an appeal -- or not moot. It certainly wouldn't technically moot it but might force Mr. Vorley to serve the sentence entirely before the appellate issues are already decided.

MR. MAZUR: Right.

THE COURT: That's what's of greatest concern to me. I think it would be fundamentally unfair to deprive Mr. Vorley of his right to appeal -- again, I'm using loose language here. I wouldn't technically deprive him of his right to appeal but meaningfully deprive him of his right to appeal the

sentence as an effective matter in any event if I don't have to do that. But I need to understand whether I have to do that or not. To do that, I have to know what issues you believe are close, what that means under the law, and I think -- I think those are the two issues that really have to be identified.

So we'll set -- I think I have to set a surrender date to get the judgment entered.

MR. MAZUR: I guess -- I'm not sure of that. I understood the Bureau of Prisons has to give, like, a reporting date, but I don't know the answer to that. And maybe if we could have even just five or ten minutes on that point, potentially that might be helpful.

THE COURT: Sure. Go ahead. If you want to confer for a few minutes, that's fine.

(Recess.)

MR. BURLINGAME: Thank you, Judge.

THE COURT: All right. Back on the record.

MR. MAZUR: Your Honor, if we could have a date in 90 days for reporting, that would I think be our request.

And in terms of the motion, if I could have three weeks to brief it, I would appreciate that, based on our schedule.

MR. BURLINGAME: That is unless Your Honor thinks you need additional time to decide the motion, obviously. We

don't want to force Your Honor into a tight schedule over the summer.

THE COURT: No, though I'm not sure I see the need for 90 days. I mean, I guess your -- I'll thank you for your consideration of the Court's schedule, but I'm not sure that I want to -- you know, if ultimately we need to extend something, I of course can do that, but -- so I'm sorry. Going back to Mr. Mazur, what were you looking at to do your brief? Three weeks?

MR. MAZUR: I would ask for three weeks.

THE COURT: Okay. I'll give you three weeks.

MR. MAZUR: Your Honor, in terms of the reporting, I wasn't thinking of the Court's schedule. I'm not as thoughtful as Mr. Burlingame about that. I was thinking about the international nature of this, of the circumstances that Mr. Vorley has, his personal circumstances. Having to leave the children in the pandemic and -- is a different thing than leaving them in normal circumstances and internationally also different. So that was really my thinking, to have him have time to get his affairs in order before if he has to serve the sentence now.

THE COURT: Mr. Young, what's the government's position?

MR. YOUNG: 90 days is -- that's acceptable to us.

THE COURT: All right. Then I'll order Mr. Vorley to

surrender to the Bureau of Prisons in 90 days. We need to put a specific date on that, which I don't have my calendar out here.

By my reckoning, that comes out right after the Labor Day holiday on September 7th. Anybody disagree with that?

MR. MAZUR: I'm a little surprised by that.

MR. BURLINGAME: It seems rather fast.

THE COURT: You're right. July, August, we should be --

MR. MAZUR: Around September 20th. I didn't calculate it.

THE COURT: September 20th at 2:00 p.m. to the designated institution.

I'll take the defendant's oral motion for bond pending appeal under advisement subject to the briefing schedule. Three weeks for the defendant.

Mr. Young, what do you want to respond?

MR. YOUNG: Could we get two weeks, Your Honor?

THE COURT: Two weeks to respond.

And I'll give you a week to reply.

MR. MAZUR: Thank you, Your Honor.

THE COURT: All right.

Anything else we need to address here today?

MR. YOUNG: Just one thing on the motion for bond

pending appeal.

We were hoping that the parties would stick to the 15-page limit according to the local rules of the Court.

THE COURT: That is the local rule. If you want more pages, you're going to have to justify it. This is a pretty discrete issue. There's not a huge -- based on what I've looked at, there isn't a huge volume of case law on it, which is why I'm interested to see what you can uncover with the briefing process.

So there is a local rule. If you seek deviation from the local rule, you'll have to file a motion.

Okay. Anything else?

PROBATION OFFICER: Judge, are there any modifications to the bond, or will the bond conditions remain the same until the reporting date?

THE COURT: Bond conditions should remain the same unless somebody suggests otherwise.

PROBATION OFFICER: Thank you, Judge.

MR. PERRY: No objection.

THE COURT: Same bond conditions.

Thank you all for your efforts here today.

Mr. Vorley, I know that you and your family are extremely disappointed with the sentence that's been imposed here. I hope that at least I have provided reasons to you that while you may not agree with, that you understand and

understand that this is a very difficult decision for the Court. I take no joy in imposing this sentence, and I wish you very much -- you and your family the best of luck going forward.

We're adjourned.

(Which were all the proceedings heard.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Kelly M. Fitzgerald* *June 24, 2020*

_______________________ __________________________

Kelly M. Fitzgerald Date
Official Court Reporter